**KRONENBERGER BURGOYNE, LLP**
Henry M. Burgoyne, III (CA Bar No. 203748)
Karl S. Kronenberger (CA Bar No. 226112)
Jeffrey M. Rosenfeld (CA Bar No. 222187)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
hank@KBInternetLaw.com
karl@KBInternetLaw.com
jeff@KBInternetLaw.com

Attorneys for Plaintiff and Judgment Creditor,
MEDIA LAB, INC.



FILED
MAY 27 2010
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:           Deputy Clerk

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>JOHN ROBERT SHOFFNER,<br><br>Debtor. | Chapter 7<br><br>Case No. 6:08-bk-21023-PC<br><br>Adversary No. 6:08-ap-01406-PC<br><br>**DECLARATION OF JIM KIRKWOOD IN SUPPORT OF MEDIA LAB, INC.'S CASE IN CHIEF**<br><br>Trial Date: May 27, 2010<br>Trial Time: 9:00 a.m.<br>Courtroom: 304 |
| **MEDIA LAB, INC.** a California corporation,<br><br>Plaintiff and judgment creditor,<br><br>vs.<br><br>**JOHN ROBERT SHOFFNER**, an individual,<br><br>Defendant and judgment-debtor. | |

Adversary No. 6:08-ap-01406-PC

DECL. OF J. KIRKWOOD IN SUPPORT OF MEDIA LAB'S CASE IN CHIEF

I, James Kirkwood, declare as follows:

1. Unless otherwise stated I have personal knowledge of the matters set forth in this Declaration.

2. I am the founder and President of Media Lab, Inc. ("Media Lab").

3. Media Lab was incorporated in 1999 as a California corporation. Since 1999, Media Lab has remained an active corporation in good standing with the State of California. Exhibit 3 is a true and correct printout of the corporate registration for Media Lab from the California Secretary of State's business portal website located at <kepler.sos.ca.gov>, which was printed out on April 19, 2010.

4. Media Lab is the publisher of the print publication "Welcome Magazine," also known as "Welcome to Southern California Magazine," which Media Lab has published continuously since 1992. I have personal knowledge of the print publication "Welcome Magazine," and Exhibit 4 is a set of true and correct copies of excerpts from Welcome Magazine from 2000 through 2005.

5. "Welcome Magazine" contains articles and information on tourist attractions in southern California. "Welcome Magazine" also sells discounted theme park tickets to Disneyland, Universal Studios, and other popular tourist locations.

6. "Welcome Magazine" is distributed to hundreds of hotels, motels, inns, convention centers, apartment communities, airports, and train stations.

7. Media Lab has expended considerable time and resources promoting the Welcome Magazine brand.

8. Since before 2000, Media Lab has also had a significant Internet presence.

9. Media Lab registered the domain name <welcomemagazine.com> in January 1997 with Internet domain registrar Network Solutions, Inc (the "Welcome Magazine Domain"). Exhibit 5 is a printout from the Domain Tools service, located at <www.domaintools.com>, which shows the historical WHOIS information for the Welcome Magazine Domain for July 2001. Domain Tools is a reputable source for

KRONENBERG    BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

1  WHOIS information and Exhibit 5 is a true and accurate copy of the historical WHOIS
2  information for <welcomemagazine.com>.

3    10.    WHOIS refers to an Internet function that allows a user to query remote
4  databases for domain name registration information. A WHOIS query reveals the
5  registrant of a domain name. July 2001 is the earliest time period in which Domain
6  Tools has archived the WHOIS data for the Welcome Magazine Domain. As Exhibit 5
7  shows, as of July 2001, the registrant of the Welcome Magazine Domain was Welcome
8  Magazine, 419 Avenida Arlena, San Clemente, CA.

9    11.    Exhibit 6 is a set of copies of invoices from Network Solutions, Inc. for the
10  registration of the Welcome Magazine Domain received by Media Lab, which I have
11  reviewed and am familiar with. Exhibit 6 shows that the Welcome Magazine Domain
12  was registered to me at Welcome Magazine located at 419 Avenida Arlena, San
13  Clemente, CA.

14    12.    Beginning in early 1998, Media Lab created detailed websites associated
15  with the Welcome Magazine Domain (the "Welcome Magazine Website"). Exhibit 7 is a
16  declaration of Kenneth Lowe, the former website designer for Media Lab, describing his
17  work on the original Welcome Magazine Website. Mr. Lowe provided this declaration in
18  support of Media Lab's original claims against Judgment Debtor and Defendant, John
19  Shoffner dba WebPros dba CityWare ("Shoffner"), in *Shoffner v. Media Lab, Inc.*, No.
20  GC034866 (Los Angeles Super. Ct.).

21    13.    In early 1998, Lowe began working on a rough outline for an Internet
22  version of "Welcome Magazine," after I had purchased the Welcome Magazine Domain.
23  Lowe designed the graphical components for the Welcome Magazine Website,
24  including the Attractions, Dining, Shopping, Current Articles and Past Articles sections
25  of the Welcome Magazine Website.

26    14.    Beginning with the March/April 2000 issue of "Welcome Magazine," the
27  cover specifically referenced the Welcome Magazine Website located at
28  <www.welcomemagazine.com>. I have personal knowledge of the print publication

KRONENBERGL  JRGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

1  "Welcome Magazine," and Exhibit 8 is a true and correct copy of the cover and
2  masthead for the March/April 2000 issue of "Welcome Magazine." As Exhibit 8 shows,
3  as of March 2000, Mr. Lowe was the Creative Director for Welcome Magazine, and that
4  there was no mention of Shoffner.

5      15.   The Welcome Magazine Website was and remains a robust website,
6  which provides informational resources about tourist attractions in southern California,
7  such as Disneyland and Legoland. The Welcome Magazine Website allowed and
8  continues to allow users to purchase discount tickets to many of these tourist attractions
9  by way of e-commerce transactions. Media Lab retains a portion of each ticket sale.

10      16.   In addition to the revenue Media Lab generates from ticket sales, Media
11  Lab derives revenue from advertisements purchased by ticket vendors on the Welcome
12  Magazine Website.

13      17.   The Welcome Magazine Website has been visited and used by hundreds
14  of thousands (if not millions) of Internet users since its inception. The Welcome
15  Magazine Website has generated and continues to generate a significant amount of
16  revenue for Media Lab.

17      18.   Except as described in this Declaration, Media Lab has owned the
18  Welcome Magazine Domain and operated the Welcome Magazine Website exclusively
19  and continuously since 1999.

20      19.   Media Lab has expended considerable time and resources into designing,
21  publishing, and optimizing the Welcome Magazine Website.

22      20.   In October 2000, Media Lab engaged Shoffner as a website designer and
23  manager on an independent contractor basis.

24      21.   Exhibit 9 is a 2004 1099-MISC federal tax form that Media Lab prepared
25  and filed regarding Shoffner's engagement with Media Lab. I filled out this form in 2004
26  and have personal knowledge of its contents.

27      22.   As part of his duties, I asked Shoffner to maintain and update the
28  Welcome Magazine Website and to register additional domain names for Media Lab's

KRONENBERG  URGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

1 use.

2   23.   Since the time of his engagement as an independent contractor, I routinely and timely paid Shoffner for his services, and reported those payments to the United States Internal Revenue Service. I also reimbursed Shoffner for his out-of-pocket business expenses, and specifically, for the registration fees for the domain names that Shoffner registered at my instruction and on Media Lab's behalf.

   24.   In 2004 alone, Media Lab paid Shoffner $6,525 for his services, as reflected in Exhibit 9.

   25.   I never granted Shoffner any ownership interest in Media Lab or in the Welcome Magazine Domain or Welcome Magazine Website. In fact, I never even discussed this issue with Shoffner in any form or in any way.

   26.   Exhibit 10 is a copy of the Welcome Magazine Website, after Shoffner began to maintain it. I printed Exhibit 10 on April 20, 2010 from the Way Back Machine also known as Archive.org. Archive.org maintains archived versions of websites and identifies the date in which the archived version was available to the public. Exhibit 10 shows Shoffner's Cityware Web-Pros logo in the lower left, under the phrase "Web Design By." At the bottom of Exhibit 10, it states: "Copyright © 2001 Media Lab, Inc."

   27.   Throughout his engagement by Media Lab, Shoffner repeatedly told me that he was fulfilling his obligations to Media Lab and the actions he was taking were for Media Lab's benefit.

   28.   In his position as Media Lab's webmaster, Shoffner gained extensive knowledge of Media Lab's business structure, including knowledge of Media Lab's online ticket sale processes and Media Lab's discounted pricing agreements with various theme parks and event centers.

   29.   In 2001, Shoffner requested and I granted him with access to the Welcome Magazine Website (and other Media Lab websites) and the Welcome Magazine Domain (and other Media Lab domains). Shoffner told me that such access was necessary in order for him to host and maintain the Welcome Magazine Website

KRONENBERG, BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

1  and other Media Lab websites. Based on Shoffner's representations, I granted Shoffner
2  with access to Media Lab's website hosting accounts and domain administration
3  accounts with Network Solutions, Inc.

4      30.    In or around early 2004, and without my consent or authorization, Shoffner
5  changed Media Lab's administrative contact information from Media Lab to himself.
6  When queried Shoffner about this change, Shoffner explained to me that it was
7  necessary for the management of Media Lab's account. At the time, I was unaware that
8  that the administrative contact controlled the registered owner information. In or around
9  mid 2004, Shoffner explained to me that he required additional access to Media Lab's
10 Network Solutions, Inc. account in order to manage Media Lab's domains and website. I
11 provided Shoffner with Media Lab's Network Solutions, Inc.'s logon password.

12     31.    Unbeknownst to me, Shoffner registered the domain names
13 <californiaamusementparks.com> and <parktickets.us> with himself and not Media Lab
14 as the owner and registrant.

15     32.    Also unbeknownst to me, Shoffner set up competitive websites associated
16 with the domain names <californiaamusementparks.com> and <parktickets.us>, and
17 attached Media Lab's merchant account to these websites, which he then submitted to
18 major search engines.

19     33.    The effect of Shoffner's actions regarding
20 <californiaamusementparks.com> and <parktickets.us> was to divert traffic intended for
21 the Welcome Magazine Website to Shoffner's own websites, where he would reap the
22 benefit of advertising and ticket sale revenues, and dilute the traffic trying to reach the
23 Welcome Magazine Website.

24     34.    In or around late 2005, I contacted Jason Berry at Toplingo.com to host
25 the Welcome Magazine Website.

26     35.    While Media Lab was transitioning its websites from Shoffner to
27 Toplingo.com (Media Lab's new website administrator), Shoffner engaged in additional
28 misconduct.

KRONENBERG BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

36. In early 2005, without my authorization or consent, Shoffner used his administrative access to Media Lab's domain account to change the account's contact information from Media Lab to Shoffner's own personal information. As a result of Shoffner's changes, all notifications regarding Media Lab's domain activity were sent to Shoffner only. This was true for all of Media Lab's domain names, including its Welcome Magazine Domain.

37. Also without my authorization or consent, Shoffner changed the DNS server for Media Lab's websites (including the Welcome Magazine Website) to Shoffner's own personal server. As a result, viewers of the Welcome Magazine Website were routed through Shoffner's computers and not those leased by Media Lab.

38. Thereafter, also without my authorization or consent, Shoffner used his administrative access to Media Lab's domain name account to transfer Media Lab's domain names (including the Welcome Magazine Domain) to Shoffner's account with a different Internet registrar.

39. Thereafter, also without my authorization or consent, Shoffner changed the registrant of Media Lab's domains (including the Welcome Magazine Domain) to name Shoffner instead of Media Lab, so it appeared that Shoffner, and not Media Lab, owned these domains.

40. Thereafter, also without my authorization or consent, Shoffner re-directed Media Lab's domain names (including the Welcome Magazine Domain) to Shoffner's own websites. Thus, users that tried to visit Media Lab's websites were taken to Shoffner's own websites instead. Users never saw Media Lab's website.

41. Shoffner had created his own competitive Internet websites, using nearly identical content to Media Lab's websites. Like Media Lab's websites, Shoffner's websites advertised southern California tourist attractions and sold discount tickets to the same.

42. Shoffner's websites looked nearly identical to Media Lab's websites, including the Welcome Magazine website, as they used the exact same format, color

KRONENBERG, URGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

1  scheme, and ad placement.  Shoffner even displayed Media Lab's WELCOME
2  MAGAZINE trademark on his website.

3      43.    While Shoffner's websites looked nearly identical to Media Lab's websites,
4  they were controlled by Shoffner.  Thus, any purchase made on the websites went
5  directly to Shoffner instead of Media Lab.  In essence, Shoffner was stealing all of
6  Media Lab's revenues from ticket sales.

7      44.    The WHOIS information for <welcomemagazine.com> shows that
8  Shoffner changed the registrant information to himself after he learned that Media Lab
9  was going to replace him.  Exhibit 1 is a printout from the Domain Tools service, located
10 at <www.domaintools.com>, which shows the historical WHOIS information for the
11 domain name <welcomemagazine.com> for March 2004.  Exhibit 1 shows that as of
12 March 2004, the registrant of <welcomemagazine.com> was properly identified as
13 Welcome Magazine at 419 Avenida Arlena, San Clemente CA.  By comparison, Exhibit
14 2 is a printout from the Domain Tools service, located at <www.domaintools.com>,
15 which shows the historical WHOIS information for the domain name
16 <welcomemagazine.com> for January 2005.  Exhibit 2 shows that as of January 2005,
17 Shoffner had changed the registrant of <welcomemagazine.com> to himself at
18 WebPros, 302 Diamond St., Arcadia, CA.

19      45.    I learned of Shoffner's misconduct when, in early 2005, Media Lab
20 engaged Toplingo.com as new website administrator and designer, and Toplingo.com
21 was unable to access Media Lab's domains or websites. Media Lab was completely
22 locked out of its websites, which as discussed, were essential to Media Lab's business.

23      46.    I immediately contacted Shoffner and demanded that he return the Media
24 Lab Domains.

25      47.    Shoffner refused to return the Media Lab Domains.

26      48.    Shoffner made multiple financial demands to me, saying that he would not
27 return the Media Lab Domains unless Media Lab paid him "a significant amount of
28 money."

KRONENBERG JURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

49. When I refused to pay Shoffner and demanded the return of the Media Lab Domains, Shoffner contacted Media Lab's discount ticket vendors, with whom Media Lab had longstanding contractual relationships. Shoffner told Media Lab's vendors that Shoffner was Media Lab's successor in interest, and that all obligations and benefits from the vendors' relationships with Media Lab should flow to Shoffner. These statements were not true.

50. As a result of Shoffner's conduct, Media Lab was substantially harmed, and on March 16, 2005, brought a cross-claim against Shoffner to recover for cybersquatting and other misconduct perpetrated by Shoffner.

51. On March 15, 2005 Media Lab filed a cross-complaint in the matter *Shoffner v. Media Lab, Inc.*, No. GC034866 (Los Angeles Super. Ct.) (the "Prior Action"). Exhibit 11 is a true and correct copy of the cross-complaint.

52. On November 1, 2006 the Los Angeles Superior Court entered Judgment in the Prior Action for Media Lab and against Shoffner for $222,995.38 (the "Prior Judgment"), finding that Shoffner had cybersquatted on the Media Lab Domains. Exhibit 12 is a true and correct copy of the Prior Judgment.

53. Since the court entered the Prior Judgment, Shoffner has not paid a cent of the Prior Judgment.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Declaration was executed this ___ day of April 2010 at Los Angeles, California.

_____
James Kirkwood

Adversary No. 6:08-ap-01406-PC            8            DECL. OF J. KIRKWOOD IN SUPPORT OF
                                                       MEDIA LAB'S CASE IN CHIEF

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com